## CITY OF HARLINGEN v. SCROGGINS.

### No. 9860.

Court of Civil Appeals of Texas. San Antonio. Jan. 20, 1937.

Rehearing Denied Feb. 17, 1937.

Hornaday & Klein, of Harlingen, for appellant.

A. J. Rabel and Carter & Stiernberg, all of Harlingen, for appellee.

MURRAY, Justice.

The nature and result of this case, as well as the substance of the pleadings, are so well stated by appellee in his brief, we will here copy same in full:

Fred R. Scroggins, appellee, brought this suit against the City of Harlingen, hereinafter referred to as "the City," and against a group of other defendants hereinafter referred to as "the Carnival Company," for injuries received by him when he was riding on an amusement device known as "The Merry Mix-up" being operated by the Carnival Company on a city-owned park as a part of the annual midwinter fair which appellee claims was conducted by the City through the agency or instrumentality of its municipally supported chamber of commerce and the latter's secretary.

Prior to 1927 about 47 acres of land were owned by a private corporation known as the "Valley Mid-Winter Fair Association" which operated an annual midwinter, or December, fair on such grounds to advertise the citrus, vegetables, and other products of the Magic Valley. In 1927 the City purchased the 47 acres in question for a park, and thereafter maintained said park throughout the year, having thereon a large auditorium and a large grandstand to seat patrons witnessing horse races and auto races and rodeos, and a large exhibit building in which to exhibit the products of the Magic Valley during its fair, and an office building and a zoo, tennis courts, picnic grounds and playgrounds for children with such amusement devices as swings, seesaws, slides, and merry-go-rounds. This park, with its many advantages, was open to the public without charge throughout the year except that during one week in the winter a fair was conducted to advertise the products of the Magic Valley, and during such week no charge was made for admission to the main gates of the park, except that a charge of 25 cents was made for the entry of each automobile, and except that charges were made by various concessionaires, such as the concessionaire who operated the rodeo and the concessionaire who operated the carnival. The 25 cents' admission charged for each car was collected and retained by the chamber of commerce and a part of the gate receipts for entry to the grandstand to witness the rodeo went to the chamber of commerce. A charge of 10 cents was made to enter the main carnival grounds and another charge of 10 cents was made to ride on the Merry Mix-up, and both of these dimes were divided on a percentage basis between the carnival and the chamber of commerce. Space was let to various private concerns for putting on exhibits and amusements, and charges were made for such purposes by the chamber of commerce. All of these funds collected by the chamber of commerce went into a common pot and were used to pay for the prizes that were awarded for exhibits during the fair and for expenses of operating the fair and for making permanent improvements upon the City's fair park.

As stated above, the Valley Mid-Winter Fair Association, a private corporation, sold the park or fairgrounds to the City in 1927, but operated the fair for the next year, 1928, on the City's fairgrounds at a loss. It then forfeited its charter and went out of existence. In 1929 the chamber of commerce voted to take over the operation of the fair and did operate the fair through its secretary each year thereafter without formal action on its part, except that no fair was held during the hurricane year of 1933. The mayor, members of the city commission, and members of the chamber of commerce all understood that it was the duty of the secretary of the chamber of commerce to put on the fair and knew that he did so each year and, in fact, it was common knowledge in the City that the City was putting on the annual fair, and his acts in putting on the fair and his general manner of handling the same was known to, acquiesced in and consented to by the mayor, and the members of the city commission and chamber of commerce, and, in general, by the entire city's population.

While the city council apparently took no formal action to turn the park over to the chamber of commerce for use during the fair week, yet by a common consent of the mayor and the city commission the fairgrounds park was turned over to the chamber of commerce for the purpose of holding the fair during fair week. Apparently the chamber of commerce took no formal action instructing its secretary to put on the annual fair, but it was understood by the members of the chamber of commerce that the duties of the secretary, for which he was being paid out of money furnished to the chamber of commerce by the City, included the duty of putting on the annual

fair, and that this was perhaps the major annual activity of the chamber of commerce.

While such fair was in progress, Fred R. Scroggins, his wife and little boy, entered the main gates of the fairgrounds, went into that part of the fairgrounds blocked off for use by the carnival and paid a dime each for admission to such part of the fairgrounds, and Mr. Scroggins and his son each bought a ticket to ride on the "Merry Mix-up," one of the amusement devices which was drawing the large crowds to the fair, and such amusement device went to pieces because of its defective condition and caused the injuries which resulted in this lawsuit, and the evidence showed, and the jury found, that the "Merry Mix-up" was not in a reasonably safe condition, and that an inspection would have disclosed its defects, and that the mayor and the city commission and the chamber of commerce, and all of their subordinates, wholly failed to make any inspection to see whether it was fit for use by the public who were permitted and, we think, impliedly invited, by the City to use the same.

The plaintiff in his petition set out the nature of the City and its government, and its charter provisions authorizing it to (1) purchase land for corporate purposes; (2) operate public service utilities and demand and receive compensation for same; (3) have exclusive control over all city parks and playgounds and provide for amusements therein, erect buildings, establish walks and driveways through said parks and playgrounds, etc.; (4) enact all ordinances and resolutions, and constitute the governing body of the City; (5) authorizing the mayor, with the advice and consent of the city commission, to appoint all appointive offices; and its charter provisions provided for the establishment and maintenance of a chamber of commerce and for taxes to support the same, and set out the creation of the chamber of commerce and the election of A. L. Brooks as secretary and manager of said chamber of commerce for the year 1934, his duties, including his duty to put on the fair, and the substance of the contract which he made with the Carnival Company whereby he, for and in behalf of the chamber of commerce, would receive 25 per cent. of the shows and riding device receipts, and $20 for each concession operated, and 33⅓ per cent. of the gate receipts charged for admission to the carnival grounds, and whereby he agreed with the Carnival Company "to work hand in hand to make the Fair an artistic and financial success." Plaintiff alleged that on January 10, 1930, the chamber of commerce adopted a motion to take over the management of the annual fair, and it did, through its secretary, manage such fair each year from 1930 to 1934, inclusive, except for the year 1933, when no fair was held on account of the hurricane, and that the funds received by the chamber of commerce and its secretary were used to pay for labor and material in making repairs to the buildings and other permanent improvements on the city's fairgrounds, and that his actions were known to, acquiesced in and consented to by the mayor, the members of the city commission and the chamber of commerce; that the City levied and collected a tax to support the chamber of commerce and allotted large sums of money each year to the chamber of commerce to pay its secretary for conducting the fair and for other purposes, and that the chamber of commerce in putting on the fair was devoting its time to the growth, advertisement, development, improvement, and increase of taxable values of said City, same being the purpose specified in the charter for which the chamber of commerce was created. Plaintiff alleged that the City failed to keep any accurate records of its proceedings, and has lost or destroyed some of same, and has no index to its minutes. Plaintiff alleged that the defendants were negligent in each of the manners found by the jury, as set out below, and set up the nature and permanency of his injuries, the cost of medical treatment, etc.

Plaintiff throughout his petition referred to the minutes of the city commission and the chamber of commerce showing the various matters alleged by him, but added that the City "failed to keep any accurate record of its proceedings and has lost or destroyed some of same, and has no index to its Minutes," and that plaintiff had called on the City's secretary and the secretary of the chamber of commerce to furnish the minutes of all proceedings referred to in plaintiff's petition, and plaintiff then made the following additional allegations:

"That said Chamber of Commerce was expressly made the agency and instrumentality of said city commission at the time of its creation and given the authority and duty of devoting its time and energy to the growth, advertisement, develop-

ment, improvement and increase of taxable values of said city, including the authority claimed in this petition for it and including the acts and duties claimed in this petition to have been performed by it, by formal action in the nature of an ordinance, resolution or motion duly adopted by said city commission, and, likewise, the authority and duty of the Secretary and manager of said Chamber of Commerce to do each of the acts alleged in this petition to have been done by him, were expressly authorized by motion and resolution duly adopted by said Chamber of Commerce on or about January 10th, 1930; that said city and its Chamber of Commerce failed to keep or have lost or destroyed the records of their actions set out in this paragraph, and plaintiff has called on them for same and has been unable to procure same; that if plaintiff should be mistaken in the allegations set out herein as to the formal action of the said City Commission and of its Chamber of Commerce, then and in such event plaintiff says that from each year after February 23rd, 1927, to this date the Mayor, with the advice and consent of the city commission, has appointed citizens of Harlingen to constitute a Chamber of Commerce in accordance with its charter provisions above quoted, and each year from January 10th, 1930, to this date, except for the year 1933, said Chamber of Commerce, by formal motion adopted by it, has elected a secretary and manager of said Chamber of Commerce, and each year from January 10th, 1930, to this date said Secretary and manager of said Chamber of Commerce managed, supervised and made contracts for the operation of said fair and carnival on the said Fair Grounds and park belonging to said city and all of the actions of said Chamber of Commerce and of its secretary and manager were known to, acquiesced in and consented to by the Mayor and all of the members of the city commission and of said city for the respective years thereof, and by a majority of the individuals thereof, and the actions of said secretary and manager of said Chamber of Commerce during each of said years was known to, acquiesced in and consented to by all, and a majority of, the members of said Chamber of Commerce for each of said years; that plaintiff has been unable to get the records of said city and Chamber of Commerce showing the formal actions of said bodies appointing said Chamber of Commerce and its secretary from 1927 to

1929, inclusive; that revenue derived from the operation of said Fair from 1930 to 1934, inclusive, was used to make permanent and temporary improvements on said Fair Grounds and park belonging to said city with the full knowledge, acquiescence and consent of the Mayor and members of said city commission for the respective years thereof, and such improvements have been retained by said city; that, except as set out in this petition, plaintiff has been unable to procure the ordinances, motions or resolutions of said city commission and of said Chamber of Commerce, although he has made diligent search for same, and says that same have been lost, misplaced or were not accurately kept. Plaintiff says that all instruments constituting the agreement which A. L. Brooks, in his capacity as aforesaid, made with the city's co-defendants, or one or all of them, as set out above, are in the possession of the defendant city, and plaintiff is unable to attach a copy thereof to this petition but has alleged the substance of all of the material parts thereof.

"In the event that it should develop on the trial of this case that the City Commission and its Chamber of Commerce, and the latter's secretary and manager, acted in holding said fair and carnival beyond the powers vested in said city commission by said charter, or beyond the powers and authorities given or granted to the said Chamber of Commerce and its secretary and manager, then and in such event plaintiff says that said city, several years prior to 1930, acquired by deed to it the property on which the accident in question occurred for the purpose of using said property as a public park and pleasure ground for the purposes of pleasure, exercise and amusement of its citizens, and has continuously since the acquisition thereof maintained the same as a public park for such purposes, and has equipped said park with an auditorium, exhibit halls, grand-stand, tennis courts, swings and other devices for the pleasure, exercise, amusement and recreation of its citizens, and that during the week of November 28th to December 3rd, 1934, the 'Mix-up' or riding device on which the plaintiff was injured was operated on said Fair Grounds, with a charge made for riding thereon, with full knowledge, acquiescence and consent of the Mayor and of all or a majority of the members of said city commission, and that such 'Mix-up' or riding device was intended to, and did, provide exercise, amuse-

ment, recreation and pleasure to the public using the same, and said park was during all of said times held open to the public, and that a portion of the proceeds of the charge made for riding on such riding device, along with other funds derived from the concessions in said park, was used and set aside for use in part for the improvement of said park with full knowledge, acquiescence and consent of said Mayor and all or a majority of said city commission, and that said city, its Mayor, Commissioners, employees and Chamber of Commerce were negligent in failing to make a reasonable inspection of said riding device of 'Mix-up' in order to see that such riding device of 'Mix-up' was safe for use by the public who came upon its Fair Grounds for pleasure, exercise, amusement and recreation, and in failing to have the same removed from its said Fair Grounds, although a reasonable inspection of such 'Mix-up' or riding device would have disclosed the same was unduly dangerous to, and unfit for, use by the persons using the same in said park, and although a reasonable inspection would have disclosed all of the defects in said riding device set out above, and such negligence was a direct and proximate cause of the injuries herein complained of; that said city has in its possession the deed to said park and the formal action of the City Commission in acquiring same, and plaintiff is unable to set out the details of said deed and formal action more fully, and said city is hereby notified to produce same at the trial of this case, as well as all other motions, ordinances and resolutions referred to in this petition."

Numerous minutes of the city council and of the chamber of commerce were introduced as exhibits. The City's secretary, D. D. Norton, testified that all of the minutes showing the transactions of the city council from October 11, 1926, to June 8, 1928 (the time during which the chamber of commerce was created), had been lost or misplaced.

Appellant in its brief has set out the defenses pleaded by the City, and, since the Carnival Company has not appealed, and their pleadings are not shown in the transcript, we cannot discuss the same.

The jury found that the defendants (1) failed to maintain the riding device in a reasonably safe condition; (2) failed to have the outside upper beams of the riding device securely attached; (3) failed to have the beam to which the riding device in which plaintiff was seated was attached, maintained at sufficient strength; (4) failed to have the car in which plaintiff was riding properly attached to the other equipment; and that such failure in each instance constituted negligence and that such negligence in each case was the proximate cause of the injuries to plaintiff.

The jury further found: (1) That a reasonable inspection would have disclosed all of the defects in said riding device found by the jury to exist; (2) that the mayor and a majority of the members of the city commission and a majority of the members of the chamber of commerce knew that the riding device or "Mix-up," on which plaintiff was injured, was being operated on the fairgrounds prior to the time of the injury and acquiesced in and consented to such operation.

The jury then found that the City of Harlingen, its officers, agents, and employees failed to make a reasonable inspection before the time of the injuries in question of the riding device, or "Mix-up," on which plaintiff was injured, to determine whether such riding device, or "Mix-up" was safe for persons to ride thereon, and that such failure was negligence and that such negligence was the proximate cause of plaintiff's injuries, and a special issue found the same thing as to the Carnival Company.

The jury further found that the mayor, and a majority of the city commission, when allotting money for the operation of the Harlingen Chamber of Commerce for the year 1934, understood that such chamber of commerce would arrange for the holding of a fair during the winter season of 1934 on the fairgrounds belonging to the City, and found that A. L. Brooks (secretary of the chamber of commerce) and a majority of the members of the chamber of commerce understood when the said A. L. Brooks was employed as secretary thereof that his duties included making arrangements for holding a fair on the Harlingen fairgrounds during the winter season of 1934, and the letting of all concessions on the fairgrounds during the operation of said fair, and that the said A. L. Brooks, in making the agreement for the operation of the carnival in question, was acting in the performance of duties which he considered himself obligated to perform under his contract of employment with the chamber of commerce, and that a majority of the

members of the chamber of commerce understood that the said A. L. Brooks was acting in the performance of his duties, which he was obligated to perform for the salary which the chamber of commerce was paying him, when he made the agreement for the operation of the carnival in question.

The jury further found that the substance of the agreement made by Brooks for the operation of the carnival was known to, and acquiesced in, by a majority of the members of the chamber of commerce, and by the mayor and a majority of its city commissioners.

The jury further found that some of the money taken in by the secretary of the chamber of commerce from the operation of its annual fair on the Harlingen fairgrounds during the years 1930 to 1934, was used in making improvements on property belonging to the city, and that the mayor and a majority of the city commission knew and acquiesced in the action of the secretary of the chamber of commerce in using such monies in making improvements on the property belonging to the City.

The jury found that the holding of the annual fairs for the years 1930, 1931, 1932, and 1934, was conducive to the "growth, advertisement, development, improvement and increase of taxable values of said city," this being the purpose for which the chamber of commerce was created under the City's charter.

The jury found against defendants on the issue of contributory negligence and unavoidable accident, and found plaintiff's damages to be $10,000, and judgment was rendered for this sum.

The defendant City duly filed its amended motion for a new trial and same was overruled, and it duly perfected its appeal, filing herein a transcript of the pleadings of the plaintiff and the defendant City, but omitting from its transcript all of the pleadings of the various defendants constituting the Carnival Company.

■ Appellant's first contention here is that the appellee's pleadings show the City to be engaged in an undertaking which was ultra vires, and therefore the trial court erred in not sustaining its general demurrer.

We sustain this contention. The above statement of the case shows that appellee's alleged grounds for recovery are based upon the theory that the City was guilty of negligence in not inspecting a "Merry-Mixup" riding device which was part of a carnival, the carnival being a part of the Valley Mid-Winter Fair, conducted by A. L. Brooks, as secretary and manager of the chamber of commerce of the City of Harlingen, the directors of the chamber of commerce having been appointed by the mayor of Harlingen. There are other allegations in the petition that the City had ratified the contract with the carnival company by the acceptance of benefits and other acts.

However, if the conducting of a regional fair, such as the Valley Mid-Winter Fair, by the City of Harlingen, was an ultra vires act, it would make no difference whether or not the contract for the carnival was properly executed by the City in the first place, or whether or not the City had ratified the same after it had been executed, if the holding of the fair was ultra vires there could be no liability on the part of the City.

■ It is true that the City, which was a home rule city of more than 5,000 inhabitants had authority by the provisions of its charter to donate money to the chamber of commerce for its maintenance and the mayor had authority to appoint the directors of the chamber of commerce, but this would give the City no control over the chamber of commerce or make it a city agency.

■ The City had a right to own land and parks and provide therein attractions and amusements, but there is no provision in the charter which would authorize the City, directly or indirectly, to sponsor a regional fair, such as the Valley Mid-Winter Fair, but such an undertaking would be beyond any authority found in the home rule charter of the City of Harlingen, and therefore ultra vires. A city is not responsible for the ultra vires act of its officers. Tharp v. Blake (Tex.Civ. App.) 171 S.W. 549; Foster v. City of Waco, 113 Tex. 352, 255 S.W. 1104; Trower v. City of Louisiana, 198 Mo.App. 352, 200 S.W. 763.

The judgment will be reversed and the cause remanded.